## MATILDA McVICKAR

*v.*

## JAMES McVICKAR.

1. If a husband treats his wife with such extreme and persistent cruelty that her existence is rendered intolerable and her life endangered, and she for that cause separates herself from him, such treatment, on his part, amounts to desertion by him.

2. It is no excuse for such cruel treatment that it is caused by habitual intoxication voluntarily indulged in, unless the wife induces or consents to the habitual intoxication.

3. If the husband, in such case, continues his habits of intoxication, making it unsafe for his wife to live with him for the statutory period of three years after the separation, her right to a divorce for desertion becomes fixed.

4. If the husband so far reforms as to render it reasonably safe for his wife to resume cohabitation, it is his duty to seek her out and manifest his reformation, and if he fail to do so, and voluntarily prolongs the separation for the statutory period after his reformation, his wife being ignorant of the change, he is guilty of desertion for the statutory period, and a fresh ground of divorce arises.

On petition for divorce.

*Mr. John A. Blair* and *Mr. Otto Crouse,* and *Mr. Hodge* (of New York), for the petitioner.

*Mr. P. Woodruff,* for the defendant.

PITNEY, V. C.

Petitioner prays to be divorced from the bonds of matrimony; on the ground of desertion by her husband, the defendant, which she alleges to have occurred in 1868. It is admitted, that since that date the parties have lived separately, and the question is as to the character of the separation.

The parties were married in May, 1862, at Ballymena, county Antrim, Ireland, where the parents of both resided. The petitioner was then barely sixteen years old; the defendant about thirty. Her father and brothers were well-to-do people, engaged in trade at Ballymena, and, as I infer, also at Belfast. Defendant was engaged in business as a linen finisher at Drumona, a village about five miles from Ballymena. They kept house at Drumona from their marriage until March, 1868. The defendant had shortly before that date failed in business, and was penniless. Petitioner's father died in 1863. In the spring of 1868, the friends of the parties on both sides united in making up a purse to send them to New York, and give defendant a chance to make a fresh start there. They arrived in New York

in the spring of 1868, with about a $1,000 in money. By September they were again penniless. Petitioner borrowed, of a Mr. Best, in New York, money enough to carry both back to Ireland. They reached Liverpool in September, 1868 ; petitioner took the night boat to Belfast, gave her husband the little money which remained after paying her fare, and left him at the wharf in Liverpool, since which time they never met until the hearing of the cause. Petitioner went at once to live with her brother, James Morton, at Ballymena, and a few days or weeks afterwards defendant followed her to Ireland, but did not see her. He remained in Ireland, and in the same neighborhood, for about two years, when he returned to New York. He lived in New York a few years and then went to Montclair, or rather Caldwell, where he has lived for some fifteen years. Petitioner spent several months with her brother and other friends in Ireland, England and Scotland, and then went to France, and afterwards to Geneva, Switzerland, where she has for many years kept a school for young ladies.

The foregoing is an outline of the married lives of the parties, and the question is, whether the causes and circumstances of the separation are such as to make the defendant guilty of " willful, continued and obstinate desertion for the period of three years " or more.

The contention of the petitioner is, that she was compelled to leave her husband, and to live separate from him, by his utter and complete neglect to provide for her, and his persistent and long-continued cruel treatment of her, by which her existence was rendered extremely miserable and her life actually endangered.

That such treatment of a wife by a husband will amount to desertion on his part is well settled in New Jersey. Chancellor Zabriskie, in *Starkey* v. *Starkey, 6 C. E. Gr. 136,* says : " In all cases where a husband either actually drives his wife from himself and his house, *or by his cruel and abusive treatment compels her to leave it for safety or comfort,* it is an abandonment and separation by him." And again, in *Laing* v. *Laing, 6 C. E. Gr. 249,* he says : " It is a recognized principle, that when a husband treats his wife with *such cruelty or violence that she is*

*obliged to leave him for safety, or to avoid personal injury,* this compulsory flight amounts to a desertion by him ; and if he does not seek his wife, and try to persuade her to return with promises of amendment, that such absence, if continued for the requisite time, is a willful and obstinate desertion on his part." And, farther on : " To convert a leaving by the wife into a desertion by the husband, *she must go away for her own safety, and to protect herself from his violence.*"

This language of Chancellor Zabriskie is repeated and adopted by Chancellor Runyon in *Sandford* v. *Sandford, 5 Stew. Eq. 421.* And Vice-Chancellor Van Fleet, in *Skean* v. *Skean, 6 Stew Eq. 148, 151,* says : " The husband may drive his wife away, or he may treat her so brutally as to compel her to flee for safety, or his conduct may be so cruel and malignant as to show that he means to force her away. If a wife, for either of these causes, separates herself from her husband, and he allows her to remain away for the statutory period, without professing sorrow for his violations of conjugal duty, and promising to amend his conduct,. and asking her to return, he, in the eye of the law, is the deserter, and she has a right to ask for a dissolution of the marriage tie." And, again, in *Weigand* v. *Weigand, 14 Stew. Eq. 202, 208,* he says : "A husband is guilty of abandonment when he compels his wife, by cruel and abusive treatment, to leave him. *If, in consequence of his conduct, she is compelled to leave his house, either to preserve her honor and self-respect, or to secure safety, he is the cause of the separation, and must be adjudged to be the wrong-doer.*" And see *Marker* v. *Marker, 3 Stock. 256.*

It is not, in my judgment, a necessary ingredient in this canon that the husband should entertain, in connection with his acts of cruelty, any settled purpose to drive his wife from him. It is enough if such is the natural consequence of his acts. Nor is the rule so laid down open to the criticism, that it is in effect giving the wife a remedy against her husband for extreme cruelty greater than the statute authorizes, viz., divorce *a vinculo matrimonii,* instead of *a mensa et thoro.* By the twentieth section of the Divorce act, if the husband deserts his wife, she may sue him at once for maintenance and support, while, if she waits three

years and his desertion continues, she may procure an absolute divorce from him. Here is clearly something like a choice of remedies on the part of the wife. A remedy by suit for maintenance may be, and often is, of no value to her, owing to her husband's worthlessness, and hence she may accept the situation, and, if her husband's separation continues for the requisite period, obtain an absolute divorce. So with the remedy of a divorce *a mensa et thoro* on the ground of extreme cruelty; it is generally of no value to the wife in a case where the husband has no estate and no earning capacity; and if the husband's conduct amounts to desertion, and is continued for the statutory period, there is no more reason in the one case than the other why the wife should not have the higher remedy of an absolute divorce.

Bearing the canon above cited in mind, I will proceed to examine the testimony in this case. There is very little conflict in it. The husband did indeed deny that he had ever consciously ill-treated his wife, but close observation of the parties while on the stand satisfies me that she is reliable in her statement. Her story is as follows: From the start her husband was a brutal drunkard, and so continued during the whole period of their cohabitation. She had heard before she married him that he had been drunk on one or two occasions, but his sister denied it, and declared that he was not at all dissipated in his habits. Petitioner was a mere child, without sufficient prudence to make close inquiry, and I do not think she can or ought to be placed in the position of one who knowingly and voluntarily marries a depraved or dissolute spouse. In addition to his disposition to drink, he appears to have had a brutal and unfeeling temperament, which was aggravated by frequent intoxication, so that he habitually kicked and beat his wife, sometimes using a cane or fire-shovel or poker. When he did this he was sometimes drunk and sometimes sober, but more frequently drunk. She declares that she was frequently seriously bruised, and that she bears the marks of his violence to this day. On one occasion, in a boarding-house in New York, in very warm weather, he locked himself and her in their room, which was at the top of the house, hid the key in his night-dress under his arm, set all the gas-jets

burning, and laid down and went to sleep, or pretended to do so. The wife remained thus incarcerated for a whole night and a part of the day, suffering intensely from heat and. mosquitoes; finally, watching the opportunity when she thought her husband was asleep, she extracted the key quietly from its place of concealment and left the room. Her husband observed her movement and, following her, seized her as she turned to descend the stairs, and lifted her by one of her arms up over the banister in what appears to have been an attempt to drag her back to their room. She screamed, for the first time, as she says, throughout all her sufferings, and some of the boarders came and rescued her. On this occasion she says he was sober. She denies that she was cross or quarrelsome or that she ever at all, or in anywise or degree, provoked or scolded her husband, or was in the least degree responsible for his brutal conduct towards her; and in this respect she is not only not contradicted, but positively corroborated by him. She declares that she did all she could to hide her husband's shame and her own sufferings, and made unceasing efforts to wean him from his brutal habits. He frankly admits the truth of her statement in this respect.

The accuracy of her picture of her married life, with all its hideous horror, is strongly corroborated by the evidence of several New York business men, who testified as to his habits and conduct for one or two years after he returned to New York in 1870. These gentlemen, who were then young men, were brought into daily contact with defendant during the period just mentioned. They show him to be not only a drunkard, but possessed of a temper which exhibited itself in acts of violence towards those who were brought into contact with him. Upon the least provocation he would throw a ruler, paper-weight, ink-stand or other object at the head of the offender.

Upon a careful review of all the evidence bearing on the subject, I am satisfied that the petitioner was entirely justified, under the canon above set forth, in separating herself from her husband at the time and in the manner she did, and that her life would have been in danger from his violence if she had continued to

live with him, even if he had been able, which he was not, to make the least provision for her support.

On this part of the case I have no difficulty whatever.

Further, the evidence satisfies me that the defendant continued to be the same dangerous man for at least three years after the separation. He claims that he has reformed and has overcome the passion for drink, and he fixes the date of his reformation as fifteen or sixteen years ago. Taking his own statement in this respect, there still remain at least three years from the separation that he was unreformed and a dangerous companion for a female, and this view is fully corroborated by the witnesses who knew him during the first two years that he lived in New York. The witness who brought his history down to the latest date showed him a mere tramp, picking up a few cents for odd jobs and spending it all for drink.

No evidence beside his own oath was produced in support of his allegation of reformation, except that his appearance, while on the stand, was that of a man not addicted to intoxication or dissipation. The fact that he did finally overcome his passion, even after indulging it for so long a time, is important. It shows he never did have what is called " rum disease; " he never reached the point where he could not control himself; and, of course, what he accomplished in 1873 or 1874 might have been done much easier in 1865 or 1868, and therefore I am driven to the conclusion, that the conduct of the defendant during all this time was willful. He got drunk because he loved to do so, and willingly gratified his desire. Conceding that all the ill-treatment of his wife was the direct result of drink, and that he was at the time unconscious of his brutal and cruel treatment of her, still she swears (and I believe her), that when he became sober she told him how he had behaved, and begged him to refrain. If, with such knowledge of the results of his intoxication, and with the power to refrain, he still persisted in indulging his desires, he must, in my judgment, according to perfectly well-settled principles, be held fully responsible for the results. Drunkenness in such case can be held no excuse, and does not qualify the cruelty. The court of errors and appeals, in *Smith*

McVickar *v.* McVickar.

v. *Smith, 13 Stew. Eq. 566,* held that an insane delusion was not an excuse for cruelty, although the cruelty was the direct off-spring of the delusion. The argument from insanity to drunkenness is *a fortiori,* since one is under the control of the offender, and the other is not.

It is true that habitual drunkenness is not, in New Jersey, a ground for even a limited divorce, but extreme cruelty is such ground, even though it be caused by drunkenness, and it is no answer to petitioner's position to say, that the result of granting a divorce in such case is, in substance, a new cause for divorce. Chancellor Zabriskie was not unmindful of this argument in laying down the canon in *Laing* v. *Laing,* for he says, in immediate connection therewith : " The causes of divorce in this state are ample, and I feel no inclination to increase or extend them by judicial construction," and in that case refused the divorce under circumstances something like those now under consideration. But he put it on the distinct ground that the acts of personal violence in that case were not sufficiently frequent, habitual and severe to be the ground of judicial separation, and that they were condoned. It is a question of degree, to be determined upon the facts of each case. I think that the acts of cruelty so often repeated, as proven in this case, would have induced Chancellor Zabriskie, if they had existed in *Laing* v. *Laing,* to have there granted the divorce.

But there is another circumstance, or set of circumstances, in the present case that are claimed, materially, to modify the defendant's conduct and avert its logical results. When the husband and wife separated at the dock in Liverpool for the last time, the parting was friendly. They evidently expected to meet again. She had not then, apparently, abandoned all hope of his reformation, or expectation of again living with him. Apparently she had no settled thoughts on the subject or plans for the future. She realized her sufferings and felt her wrongs, but knew nothing of her rights or what remedy she could command. After reaching her brother's house in Ballymena, she wrote her husband two or three friendly, if not affectionate, letters, but very shortly she was induced to disclose her sufferings

32

McVickar *v.* McVickar.

to her brother. He at once insisted that she should not again expose herself to the danger of living with her husband. By his advice, she wrote her husband the following letter, which he received and has preserved all these years. It is without date, but was evidently written in the fall of 1868:

"BROOKVILLE, Monday.

"SIR—I write this to inform you that it is my desire and determination to live apart from you from henceforth, in which I find the law will support me. I have not formed this resolution hastily, nor have I been influenced in the matter by any one. I wrote from America to my brother Nathaniel, stating that if I could manage to get home in safety, nothing could persuade me to live with you. I have suffered too much at your hands to again place myself in your power. With regard to the two letters I wrote you to Liverpool, I wrote them to fulfill a promise given to you when parting, and given for the purpose of getting a quiet riddance; and as to writing you to remain in England, I can only say that I was so disturbed and harassed by all that had occurred that I really did not know how to treat you. I received all your letters duly, and did not reply to any of them, as I was still expecting to hear of your departure, which you mentioned as likely to happen. I am quite willing to have a legal separation, but a meeting you need not expect. There are some things of yours here, which my brother will send either to John McVicar or Mr. Mantell, as you may direct him. I trust you will rest satisfied with the evil you have already caused, and for the time to come leave me in peace. Wishing you brighter prospects, I am

"MATILDA McVICKAR."

After receiving it he wrote her repeatedly and got no reply. She received none of his letters. It is probable they were intercepted by her brother. Defendant suspected the interception, and wrote her brother about it, without success. He remained in Ireland, without seeing or communicating with his wife, other than as above stated, for about two years, when he returned to New York. In the meantime she set about finding some means of support, and after recovering her health, which appears to have been considerably shattered, went to France and entered a ladies' school as assistant, to learn the language and finish her general education. During her stay in Great Britain, and afterwards, as often as opportunity offered, she made inquiry after her husband, and all she heard was, that he was a miserable drunkard. She

never heard of his reformation, and for many years heard nothing, and supposed him to be dead.

For the first year or two after defendant came to New York, he said he made frequent attempts to communicate with his wife through Mr. Best and others, but without success. He said he understood her brothers resisted all his attempts. Petitioner swears that none of his communications or messages reached her. But defendant admits that, after his alleged reformation, he made no further attempt to reach his wife; did not write to her or take any means to inform her of the change in his habits. He says he thought it would be useless to make further efforts to that end. When pressed to explain why he did not do so, he put himself on the attempt to communicate with her in 1868, and her letter of that year, above set forth. But, in point of fact, he did not, at the time, interpret that letter as a final dismissal, for he swears to frequent efforts to communicate with her afterwards, both while in Ireland and for the first year or so after his return to New York. According to his statement, it was only after he had reformed that his efforts ceased. The evidence satisfies me that defendant could easily have reached his wife had he chosen to do so. He is a man of considerable education, intelligence and business capacity. He had brothers and friends living in the neighborhood of his wife's friends in Ireland. He could have gone there, and demonstrated to them and the world that he had reformed, and that it was safe and proper for his wife to resume cohabitation with him. It was his duty to do this, unless he was justified in considering her letter of 1868 as a final dismissal, irrespective of a change in his habits. And this brings us to the consideration of the effect upon the rights of the parties of the letter in question.

In order to give the deserted spouse a right to a divorce, on account of the desertion, it must have been against the wish and consent of such deserted spouse. This is the well-settled rule. But it is manifest from all the cases, and especially from *Sargent* v. *Sargent, 9 Stew. Eq. 644,* reversing the same case in *6 Stew. Eq. 204,* that the disposition of the court is not to consider the conduct and words of the wife very strongly against her in such

cases. *Cornish* v. *Cornish, 8 C. E. Gr. 208 ; Bowlby* v. *Bowlby,. 10 C. E. Gr. 406, 570.*

The husband, in this case, must have understood the letter as justifying the separation, on the ground of his cruelty to her. Read in the light of the evidence in this case, it said, in effect : I have lived with you and suffered from your cruelty for six. long years and more; I have been a faithful, loving wife, and have tried my best to induce you to refrain from drink, and be a kind husband; I have failed, and have no hope that you will. ever reform; therefore I cannot see you, or again trust myself in your power. Now, clearly, under the canon above cited, a woman who leaves her husband because it is unsafe for her to cohabit with him, and under such circumstances as to make him and not her the deserter, does not *consent* to such desertion. To hold the affirmative of such proposition is to destroy the canon itself. Hence, it follows that if the husband does not, before the lapse of the statutory period, so amend his ways as to render it safe for his wife to resume cohabitation, her right to a divorce becomes fixed. The burden of proving such reformation is on the offending party. I think the defendant has failed to overcome the burden so resting on him. I am very far from satisfied. that, at any time within three years from September, 1868, it would have been safe for his wife to live with him.

But, conceding that petitioner's rights did not become fixed before defendant's alleged reformation, the question still remains as to the effect of his subsequent conduct. He says he made no effort to regain her esteem and confidence, because he considered. her letter of 1868 as a final dismissal. I have already shown that he did not at the time so consider it, but claims to have made repeated efforts to see and communicate with her, within the ensuing three years; and I am well satisfied that he failed in those attempts simply and solely because those who surrounded his wife, and those whom he employed as intercessors, were well satisfied that he had not reformed, and that they would be inflicting an injury on the wife by bringing them together. I have no doubt Mr. Best may have promised him to make efforts, on his visits to Ireland, to bring about a reunion, but I do not believe

that he really endeavored to do so. The hearing was adjourned in order to enable the petitioner to produce Mr. Best as a witness, but she did not do so, and I am satisfied that it was not her fault that he was not produced. I am further satisfied, from all the circumstances, that if defendant had been able to satisfy his wife's friends that he was reformed, he could have gained access to her. Still, if the letter in question should properly be construed as a final dismissal, regardless of any change in his habits, then the petitioner must be considered as consenting to the separation, and cannot ask for a decree by reason of his failure to return after his reformation. But I think the document is not properly subject to such construction. It would, perhaps, have been more satisfactory if she had said, in so many words, that when he reformed and made himself a safe person for a woman to live with, she would resume cohabitation. But I do not think the omission of such expression alters the rights of the parties. The fault of the husband was his cruel treatment of his wife, caused, from his own standpoint, by his passion for drink. It was plainly his duty, notwithstanding that letter, if he wished to alter his position towards his wife, to remove the fault by refraining from drink and by reformation, and to demonstrate to his wife that there was reasonable ground to believe that his reformation was permanent, so that it would be safe for her to resume cohabitation with him. In this view I am supported, in addition to the cases above cited, by Vice-Chancellor Bird's opinion, in *Grant* v. *Grant, 9 Stew. Eq. 502.* There a wife left her husband on account of extreme cruelty on his part. After the statutory period of three years, he sued her for divorce on the ground of desertion. She set up, in answer, that she had not deserted him, but that she was justified in leaving him on account of his cruelty. It appeared that, shortly after the separation, he promised to behave better in the future, and begged her to come back. She declined, in a letter couched in language expressing quite as strong a determination not to live with him or see him again as the letter of the petitioner in this case. The husband, in the case above cited, made no further effort to induce his wife to return to him. The learned vice-chancellor held, that his conduct in that respect

was not satisfactory, and that he ought not to have considered¹ his wife's letter as final, but should have made further efforts to. induce her to return, and that his conduct, under the circum-- stances, amounted to a consent to the continuance of the separa-tion.

I come, therefore, to the conclusion, that the petitioner is enti-tled to her divorce on two grounds : *First.* That she was entirely· justified in separating herself from her husband ; that his treat-ment of her was so cruel and so long-continued and persistent, as to render the separation desertion on his part, under the canon above laid down, and that it would have been unsafe for her to· return to him at any time within three years after the separation, and that her right to a divorce then became fixed. *Second.* If,. however, the husband's cruelty was not of such intensity as to· amount to desertion, still it was such as to justify the wife in temporarily separating herself from him, and it was his duty to· seek a return. This he did not do, but for many years remained· entirely passive, manifesting no interest in her welfare or desire· to resume marital relations. This, under the circumstances, con-stituted desertion, and entitles the wife to a decree.